IN THE UNITED STATES DISTRICT COURT

DISTRICT OF UTAH

| | | |
|---|---|---|
| IN THE MATTER OF THE SEARCH OF A BLUE AND BLACK MOTOROLA SMARTPHONE | ) ) ) ) ) ) ) ) ) ) | CASE NO. 2:24mj831 CMR <br><br> Magistrate Judge Cecilia M. Romero <br><br><br> AFFIDAVIT IN SUPPORT OF SEARCH WARRANT |

**I.**

**BACKGROUND AND EXPERIENCE**

I, Benjamin Jones, a Special Agent with the Federal Bureau of Investigation, being duly sworn, depose and state:

1. I am a Special Agent with the FBI and have been employed in this capacity since February 2009. Previously I worked for three years with the Salt Lake City, UT Police Department. Currently I am assigned to the Vernal Resident Agency/Salt Lake Field Office of the FBI. In this capacity I investigate violations related to crimes of violence, firearms violations, illegal

drug violations and many others, including these kinds of violations in Indian Country, as it is defined under federal law.

2. I am presently involved in an ongoing federal criminal investigation of Michael Lindsay ("LINDSAY) for violations of Title 21 United States Code (USC) § 841(a)(1) *Possession of Fentanyl with Intent to Distribute* (SUBJECT OFFENSE).

## PURPOSE OF AFFIDAVIT

3. The purpose for this affidavit is to support an application to the Court for a search warrant authorizing the searching of the following:

   - A blue and black Motorola smartphone with a cracked screen, seized from the possession of LINDSAY, referred herein as the "**SUBJECT PHONE**," further described in ATTACHMENT A, which is included below with this affidavit.

4. The purpose of the requested search warrant is to search for and seize (1) property and information that constitute evidence of the SUBJECT OFFENSES; and (2) property designed or intended for use which is or has been used as a means of committing a criminal offense in regard to the **SUBJECT PHONE.** The evidence to be searched for and seized is described more fully described in ATTACHMENT B, which is included (below) with this affidavit.

5. Since this affidavit is being submitted for the limited purpose to obtain a search warrant for the **SUBJECT PHONE,** I have not included details of every aspect of the investigation. My interpretations of certain statements or words are set forth in brackets and are based upon my knowledge of this investigation and my training and experience. I learned the matters set out in this affidavit from my review of reports, records, affidavits, etc., through discussions with other law enforcement officers/personnel, and from my own investigation which caused me

to believe the information to be true. Dates and times are approximate. Times are in or were converted to Mountain Time (MT) unless otherwise stated.

### III.

### FACTS ESTABLISHING PROBABLE CAUSE

6. As set forth in more detail below, I believe that there is probable cause that the **SUBJECT PHONE** contains evidence of the **SUBJECT OFFENSE** based on the following facts.

7. On August 1, 2024, LINDSAY was arrested on a federal charge of Possession of Fentanyl with Intent to Distribute. At the time of his arrest, he had the SUBJECT PHONE on his person. This application seeks approval to search that phone. The following outline highlights parts of the investigation into LINDSAY.

8. On April 21, 2024, at approximately 7:59 PM, Officer R. Mcgaha of Naples, UT Police Department, conducted a traffic stop at 2300 South 1500 East, Naples, Utah on a vehicle driven by LINDSAY. Teresa Lindsay was a passenger. The traffic stop was conducted for a violation of crossing a sidewalk without stopping prior to, and without stopping before entering the roadway. Officer Mcgaha noticed an odor of marijuana emitting from the vehicle and conducted a probable cause search of the vehicle.

9. While officers were searching LINDSAY's vehicle, FBI Task Force Officer (TFO) Bevan Watkins spoke to LINDSAY about a case where Uintah Basin resident, Aaron Shiozaki died of a suspected fentanyl overdose. LINDSAY agreed to speak with TFO Watkins. TFO Watkins read LINDSAY his Miranda rights and LINDSAY advised he understood his rights and agreed to speak with TFO Watkins. LINDSAY provided the following information:

10. TFO Watkins advised LINDSAY that LINDSAY was dealing "a lot of shit" in the Uintah Basin. LINDSAY responded, "ya". LINDSAY denied giving Shiozaki the fentanyl pills that caused his death.  When TFO Watkins accused LINDSAY of distributing fentanyl pills, LINDSAY said that TFO Watkins was "not wrong" but was adamant he did not supply the fentanyl pills to Shiozaki on the evening before Shiozaki was found dead.

11. LINDSAY stated that he did not want to talk on camera (referencing TFO Watkins' Body Worn Camera) but said that he might be willing to talk later and that he had some information about "a substantial amount of shit" arriving in the Uintah Basin. End of interview with LINDSAY on April 21, 2024.

12. On April 27th, 2024, TFO Watkins received information from a source, who wishes to remain anonymous, that LINDSAY was bringing in "eight boats" or eight thousand fentanyl pills, into the Uintah Basin.

13. On April 28th, 2024, LINDSAY asked to meet with TFO Watkins. LINDSAY voluntarily met with TFO Watkins at a Naples City police building. He provided the following information:

14. LINDSAY stated that he felt "the heat on my neck". TFO Watkins advised LINDSAY that law enforcement knew he was selling drugs.  LINDSAY admitted that he had been selling drugs for a few months. TFO Watkins asked LINDSAY about the "eight boats" arriving. LINDSAY advised it was "30 boats" meaning LINDSAY had 30,000 pills coming to him. LINDSAY's supplier was a black male who uses the name "ATL". ATL wanted to set up a drug dealing operation in the Uintah Basin and LINDSAY was going to assist. LINDSAY contacted ATL via Facebook. LINDSAY has made trips to ATL's residence in Phoenix, Arizona and transported fentanyl from this location to the Uintah Basin. On one occasion,

ATL sent LINDSAY nine pills in the mail to test. LINDSAY smoked them. In Vernal, the colored pills sell faster because users think they are better. LINDSAY sells fentanyl for eight to ten dollars a pill.

15. LINDSAY sells pills on the Ute Reservation. One of his buyers on the reservation is Wanda Warden. [Note: several months ago, Wanda Warden was arrested on the reservation for being in possession of fentanyl and methamphetamine. During an interview, Wanda admitted that LINDSAY had been supplying her with fentanyl pills.] On the reservation, fentanyl pills go for over $20 a pill.

16. During this recorded interview, LINDSAY stated, "if it's any consolation, I swear to God I made him put them at half speed, the pills, they're fucking half the, they're making them"… "I told them I can't have them anymore; all the fucking people are dying". End of interview with LINDSAY on April 28, 2024.

17. On May 17th, 2024, TFO Watkins assisted with the execution of a search warrant at Eric Williamson's residence in Vernal, UT where approximately 5,000 fentanyl pills were seized along with a 9mm handgun and a 38-caliber revolver. During an interview with Eric Williamson shortly after the search, Williamson provided the following information:

18. All the fentanyl pills in the residence belonged to LINDSAY. Williamson buys pills from LINDSAY for $500 for 100 pills, then sells them for $10 each. He stated that around a couple weeks earlier LINDSAY had brought the pills to his house in a red Volkswagen.

19. On May 20th, 2024, during an interview with TFO Watkins, LINDSAY provided the following additional information:

20. About five weeks ago LINDSAY transported three to four thousand pills of fentanyl from Arizona to the Uintah Basin. He sold the pills to Williamson for five dollars a pill.

21. On May 20, 2024, TFO Watkins collected a cell phone belonging to LINDSAY from LINDSAY's property at the Duchesne County Jail. On June 9, 2024, TFO Watkins executed a search warrant on this phone. A subsequent Cellebrite examination revealed the following:

22. LINDSAY has multiple text conversations related to drug trafficking. These text messages extend from about April 23, 2024, to May 9, 2024. In these messages, LINDSAY discusses his travel to Arizona where he has purchased drugs in the past. LINDSAY discusses getting a new plate for his vehicle. From my training and experience I know that drug traffickers often use different plates to avoid law enforcement detection. LINDSAY sends a text saying that he does not want to take the car anywhere with "shit" in it, presumably without a better license plate. From my training and experience I know that drug users often use the term "shit" to refer to illegal narcotics. Individuals send multiple messages to LINDSAYS's phone asking if the senders can stop by, meet up, or get something from LINDSAY. The most explicit was "Hey can I buy a little clear from you" from an unknown contact on 5/1/2024. From my training and experience I know that "clear" is drug slang for methamphetamine. There are also several messages referring to payments.

23. LINDSAY had previously told law enforcement that he had gone out of state around this time in order to get a red Volkswagen for another person. This appears to be the vehicle he is alluding to in the text conversations when he talks about transporting "shit," and was later seen with by Williamson when he brought the drugs to the latter's house.

24. On July 21, 2024, Jessica Harnden and LINDSAY were arrested in Mesquite, Nevada. LINDSAY was arrested for Possession of a Controlled Substance and Harnden was arrested for Destruction of Evidence and Possession of drug paraphernalia. LINDSAY was able to bail out but Harnden, who was on federal probation, remained in custody.

25. On July 31, 2024, a federal arrest warrant was issued for LINDSAY for Possession of Fentanyl with Intent to Distribute. On August 1st, 2024, TFO Watkins contacted LINDSAY and took him into custody on this warrant at 2505 South Vernal Ave., Vernal, Utah. During this arrest, TFO Watkins found a cellphone (SUBJECT PHONE) on his person. LINDSAY advised that this phone belonged to Harnden. LINDSAY advised that to open the phone you put your finger on the keypad and trace an "L" shape.

26. TFO Watkins retained SUBJECT PHONE and placed it into a secured locker at the Uintah County Sheriff's Office.

V.

TECHNICAL TERMS, ELECTRONIC STORAGE, AND FORENSIC ANALYSIS

A. **Technical Terms**

27. Based on my training, experience, and information told to me by other law enforcement officers, I use the following technical terms to convey the following meanings:

    a. Cellular Device: A cellular device (or mobile telephone, or wireless telephone or cell phone) is a handheld wireless device used for voice and data communication through radio signals. These cellular devices send signals through networks of transmitter/receivers, enabling communication with other wireless telephones or traditional "land line" telephones. A wireless telephone usually contains a "call log," which records the telephone number, date, and time of calls made to and from the phone. In addition to enabling voice communications, wireless telephones offer a broad range of capabilities. These capabilities include: storing names and phone numbers in electronic "address books;" sending, receiving, and

storing text messages, e-mails, and other electronic communications through various applications; taking, sending, receiving, and storing still photographs and moving video; storing and playing back audio files; storing dates, appointments, and other information on personal calendars; and accessing and downloading information from the Internet. Wireless telephones may also include global positioning system ("GPS") technology for determining the location of the device.

b. Digital camera: A digital camera is a camera that records pictures as digital picture files, rather than by using photographic film. Digital cameras use a variety of fixed and removable storage media to store their recorded images. Images can usually be retrieved by connecting the camera to a computer or by connecting the removable storage medium to a separate reader. Removable storage media include various types of flash memory cards or miniature hard drives. Most digital cameras also include a screen for viewing the stored images. This storage media can contain any digital data, including data unrelated to photographs or videos.

c. Portable media player: A portable media player (or "MP3 Player" or iPod) is a handheld digital storage device designed primarily to store and play audio, video, or photographic files. However, a portable media player can also store other digital data. Some portable media players can use removable storage media. Removable storage media include various types of flash memory cards or miniature hard drives. This removable storage media can also store any digital data. Depending on the model, a portable media player may have the ability to store very large amounts of electronic data and may offer additional features such

as a calendar, contact list, clock, or games.

d. GPS: A GPS navigation device uses the Global Positioning System to display its current location. It often contains records the locations where it has been. Some GPS navigation devices can give a user driving or walking directions to another location. These devices can contain records of the addresses or locations involved in such navigation. The Global Positioning System (generally abbreviated "GPS") consists of 24 NAVSTAR satellites orbiting the Earth. Each satellite contains an extremely accurate clock. Each satellite repeatedly transmits by radio a mathematical representation of the current time, combined with a special sequence of numbers. These signals are sent by radio, using specifications that are publicly available. A GPS antenna on Earth can receive those signals. When a GPS antenna receives signals from at least four satellites, a computer connected to that antenna can mathematically calculate the antenna's latitude, longitude, and sometimes altitude with a high level of precision.

e. PDA: A personal digital assistant, or PDA, is a handheld electronic device used for storing data (such as names, addresses, appointments or notes) and utilizing computer programs. Some PDAs also function as wireless communication devices and are used to access the Internet and send and receive e-mail. PDAs usually include a memory card or other removable storage media for storing data and a keyboard and/or touch screen for entering data. Removable storage media include various types of flash memory cards or miniature hard drives. This removable storage media can store any digital data. Most PDAs run computer software, giving them many of the same capabilities as personal computers. For

example, PDA users can work with word-processing documents, spreadsheets, and presentations. PDAs may also include global positioning system ("GPS") technology for determining the location of the device.

f. IP Address: An Internet Protocol address (or simply "IP address") is a unique numeric address used by computers on the Internet. An IP address is a series of four numbers, each in the range 0-255, separated by periods (e.g., 121.56.97.178). Every computer attached to the Internet computer must be assigned an IP address so that Internet traffic sent from and directed to that computer may be directed properly from its source to its destination. Most Internet service providers control a range of IP addresses. Some computers have static—that is, long-term—IP addresses, while other computers have dynamic—that is, frequently changed—IP addresses.

g. Internet: The Internet is a global network of computers and other electronic devices that communicate with each other. Due to the structure of the Internet, connections between devices on the Internet often cross state and international borders, even when the devices communicating with each other are in the same state.

28. Based on my training, experience, and information told to me by other law enforcement officers, I know that "smartphones" like the **SUBJECT PHONE**, have capabilities that allow it to serve as a wireless telephone, digital camera, portable media player, GPS navigation device, and PDA. In my training and experience, examining data stored on devices of this type can uncover, among other things, evidence that reveals or suggests who possessed or used the device.

B. **Electronic Storage and Forensic Analysis**

29. Based on my training, experience, and conversations with agents and officers who analyze cell phones and computers, I know that electronic and cellular devices can store information for long periods of time. Similarly, things that have been viewed via the internet are typically stored for some period of time on the devices like the **SUBJECT PHONE**. This information can sometimes be recovered with forensic tools.

30. *Forensic evidence.* As further described in ATTACHMENT B, this application seeks permission to locate not only electronically stored information that might serve as direct evidence of the crimes described on the warrant, but also forensic evidence that establishes how the Device was used, the purpose of its use, who used it, and when. There is probable cause to believe that this forensic electronic evidence is on the **SUBJECT PHONE** because:

   a. Data on the storage medium can provide evidence of a file that was once on the storage medium but has since been deleted or edited, or of a deleted portion of a file (such as a paragraph that has been deleted from a word processing file).

   b. Forensic evidence on a device can also indicate who has used or controlled the device. This "user attribution" evidence is analogous to the search for "indicia of occupancy" while executing a search warrant at a residence.

   c. A person with appropriate familiarity with how an electronic device works may, after examining this forensic evidence in its proper context, be able to draw conclusions about how electronic devices were used, the purpose of their use, who used them, and when.

   d. The process of identifying the exact electronically stored information on a storage medium that are necessary to draw an accurate conclusion is a dynamic process.

>Electronic evidence is not always data that can be merely reviewed by a review team and passed along to investigators. Whether data stored on a computer like device is evidence may depend on other information stored on the computer and the application of knowledge about how a computer behaves. Therefore, contextual information necessary to understand other evidence also falls within the scope of the warrant.
>
>e. Further, in finding evidence of how a device was used, the purpose of its use, who used it, and when, sometimes it is necessary to establish that a particular thing is not present on a storage medium.

31. *Nature of examination.* Based on the foregoing, and consistent with Rule 41(e)(2)(B), the warrant I am applying for would permit the examination of the device consistent with the warrant. The examination may require authorities to employ techniques, including but not limited to computer-assisted scans of the entire medium, that might expose many parts of the device to human inspection in order to determine whether it is evidence described by the warrant.

32. *Manner of execution.* The **SUBJECT PHONE** was seized from LINDSAY during his arrest on August 1, 2024 and is currently in the Uintah County evidence locker in Vernal, UT. I submit, that because the **SUBJECT PHONE** is in evidence, and there are no harms that could result from it being searched at any time it is reasonable for the Court to authorize execution of the warrant at any time in the day or night.

33. *Summary.* Based on LINDSAY's well documented history of fentanyl distribution, messages indicating drug distribution on his previous phone, and his possession of SUBJECT PHONE on the date of his arrest for federal drug charges after appearing to still be involved in drugs,

I believe there is probable cause that evidence of the distribution of fentanyl on SUBJECT PHONE now exists.

## VI.

## ITEMS TO BE SEIZED

34. Based on the foregoing, I respectfully submit that there is probable cause to believe that evidence of Possession of Fentanyl with the Intent to Distribute during the relevant time period (April 1, 2024 to August 1, 2024), and which are detailed in ATTACHMENT B, will be found in the **SUBJECT PHONE** described in ATTACHMENT A.

## VII.

## CONCLUSION

35. Based on the foregoing, there is probable cause to conclude that LINDSAY used the **SUBJECT PHONE** around the time of SUBJECT OFFENSE and or to help in facilitating communications about the SUBJECT OFFENSE. As such, there is probable cause to conclude that the **SUBJECT PHONE** contains evidence of violations of the SUBJECT OFFENSE.

   I declare under penalty of perjury that the above is true and correct to the best of my knowledge and belief.

_____

BENJAMIN JONES

Special Agent, Federal Bureau of Investigation

Subscribed and sworn to before me on this  21st   day of August, 2024.


_____
HONORABLE CECILIA M. ROMERO
UNITED STATES MAGISTRATE JUDGE
DISTRICT OF UTAH

ATTACHMENT A

The property to be searched:

**SUBJECT PHONE**: A blue and black Motorola smartphone with a cracked screen, seized from the possession of LINDSAY currently located in an evidence locker at the Uintah County Sheriff's Office in Vernal, UT.





ATTACHMENT B

ITEMS TO BE SEIZED

The following items stored electronically as documents, records, files, communications and other electronic formats in **SUBJECT PHONE, more fully described in attachment A**, between the time period of April 1, 2024 to August 1, 2024, that constitute fruits, instrumentalities, and/or evidence of crimes against the United States of America including Title 21 United States Code (USC) § 841(a)(1) *Possession of Fentanyl with Intent to Distribute*

As used above, the terms "documents", "records", "files", "communications" and "information" include all of the below items of evidence in whatever form and by whatever means they have been created or stored in **SUBJECT PHONE**:

a.  Information and communications documenting the *Possession of Fentanyl with Intent to Distribute*, communications between coconspirators known and unknown discussing *Possession of Fentanyl with Intent to Distribute* which may be documented in call logs, emails, drafts, notes, applications, text messages, and other means of communication.

b.  Records of internet activity, including firewall logs, caches, browser history and cookies, "bookmarked" or "favorite" web pages, search terms that the user entered into any internet search engine, and records of user typed web addresses.

c.	Evidence of user attribution showing who used or owned **SUBJECT PHONE** at the time the items described in this warrant were created, where they used it, edited, or deleted, such as logs, phonebooks, saved user names and passwords, documents, and browsing history.

d.	Pictures, videos, screenshots, and other media and visual evidence of *Possession of Fentanyl with Intent to Distribute*.

e.	GPS and physical locations stored on **SUBJECT PHONE**.